**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.** 1:20cv24390

**4 GP, INC., a corporation, BRETT RICE, an individual, And VICTOR BONOMI, an Individual,**

Plaintiffs,

vs.

**TURNING POINT BRANDS, INC., INTERNATIONAL VAPOR GROUP, INC., GRAHAM PURDY, an individual, MARC WAXMAN, an individual, CORTNI LEWIS an individual, JOHN DOES 1-10, and ABC COMPANIES 1-10,**

Defendants.
_________________________________/

**COMPLAINT AND JURY DEMAND**

**NATURE OF THE ACTION**

1. This action involves the intentional and malicious conversion by Defendants, Turning Point Brands, Inc. ("TPB") and International Vapor Group, Inc. ("IVG"), Mr. Graham Purdy ("Purdy"), Mr. Marc Waxman ("Waxman") and Ms. Cortni Lewis ("Lewis"), of the Plaintiffs, 4GP, Inc., Mr. Brett Rice and Mr. Victor Bonomi's (hereinafter collectively referred to as "Plaintiffs") multi-million-dollar investment in the operation of multiple Plaintiffs' VaporFi Franchising, LLC ("VFI") franchise locations in the VaporFi-brand franchised derived from their franchise and development rights in that system.

2. This action also involves Defendants TPB, IVG, Purdy, Waxman and Lewis' purposeful tortious interference with Plaintiffs' business relationship with both VFI and the

"VaporFi" brand franchise, by and through their collective efforts to intervene in Plaintiffs' contractual relationship with the franchisor and by purporting to terminate Plaintiffs' franchise rights, despite not being parties to the Plaintiffs' VFI franchise agreement, development agreement or related agreements, and despite not having any rights thereunder.

3. IVG defines itself as the parent company of VFI. It further defines TPB as the parent of IVG (after an acquisition of that entity in September 2018) and as the "grandparent" of VFI.

4. TBI and IVG and their respective management have vigorously denied, despite arguments and empirical evidence to the contrary, that one or both of these entities have controlled the day-to-day operations of VaporFi Franchising from at least 2018 until the present time. Notably, certain VFI personnel, including but not limited to Defendant Lewis are also employed and/or have managerial roles at IVG and have had such dual roles for years. Also, since acquiring IVG and VFI in September 2018, Purdy, TPB's CEO and certain other TPB personnel have been taking increasingly prominent role in the decision making and operation of the subsidiary franchise system at both the macro- and micro- level. More specifically, TPB representatives such as Defendant Purdy were running day-to-day franchise operations and taking part in franchisee conference calls and meetings. Additionally, Defendant Lewis, who appeared to hold a dual role at Defendant IVG and VFI, indicated to franchisees that TPB was making substantially all of the primary business decisions for the franchisees from late 2018 forward.

5. TPB and IVG have also consistently denied that they were acting in the capacity of the franchisor when they took the complained of action against Plaintiffs – specifically "terminating" Plaintiffs' by letter (from TPB's own letterhead) without any actual notice and

without contractual right or authority to do so – and have also denied that any other action they have taken connection with the VaporFi franchise was in the capacity of the franchisor.

6. In or about Spring 2019, after months of continued issues in the VFI franchise related to the franchisor's apparent attempt to divert business from its franchisees' brick-and-mortar physical store locations to its corporate online store, Plaintiffs, together with certain other aggrieved franchisees, began to approach management with myriad questions and concerns about the viability of the franchise system and the ongoing failure of the franchisor VFI to properly account for product sales and compensate franchisees in accordance with the parties' agreement.

7. Plaintiffs and certain other franchisees also discovered in late Spring/early Summer 2019 that VFI and its management had made purposeful fraudulent omissions in the Franchise Disclosure Document ("FDD") that had been disseminated in various iteration since 2014.[1]

8. As 2019 progressed, Plaintiffs, due to their desire to preserve their significant stake in the business and long-standing relationship with VFI, took a prominent and perhaps even leading role in these discussions, which typically included VFI personnel as well as certain representatives of IVG and TPB. Defendant Purdy, in particular, would listen in on franchisee conference calls with management (unannounced) and subsequently began to lead said calls.

9. Plaintiffs, together with certain other aggrieved VFI franchisees, also had approached VFI numerous times regarding accounting discrepancies for product sales that had resulted in Plaintiffs being divested of revenues for product sales.

10. In response to Plaintiffs' analysis and associated complaints, VFI admitted that they had made numerous (and material) accounting errors and that the parties engaged in a several

---

[1] Plaintiffs and all other VFI franchisees relied upon these various fraudulent misrepresentations, which shall be the subject of a separate action by Plaintiffs.

months-long negotiation to correct these errors. When challenged, Defendants, and particularly Defendant Lewis, indicated that there was "no way to figure out" the amount of money owed to Plaintiffs and other franchisees who were not been properly compensated for sales. Plaintiffs, like most other franchisees in the VFI system, had temporarily suspended their payment of royalties during this time as an off-set to the monies VFI admitted had not been paid to them. Defendant Lewis specifically confirmed to Plaintiffs that such offset would be permitted. Upon information and belief, VFI took no formal legal action against other similarly-situated VFI franchisees, despite the fact that a majority of the system's franchisees had suspended their payments.

11. VFI's typical procedures for franchisee termination are to send its franchisees a formal notice of default by certified mail that specifically advised of their contractual right and opportunity to cure the alleged default. In the event the default is not "cured" within the time prescribed in the notice, VFI reserves the right to terminate the franchisee's rights under their franchise agreement. A subsequent notice of termination is then sent with close-down procedures and a de-branding directive.

12. Plaintiffs' dispute with VFI escalated somewhat in 2019 progressed and at one point Plaintiffs' ceased paying VFI their monthly franchise royalty payments after it was admitted that VFI had improperly withheld store revenues for product sales. VFI understood why these payments were being withheld and continued to attempt to resolve the accounting issues, or at least purported to be doing so in good faith. Once again, Defendant Lewis, acting on behalf of VFI, IVG, and, upon information and belief, at the express direction of TPB, Purdy and Waxman, that Plaintiffs would be permitted to withhold the amounts until the ongoing accounting issues were resolved.

13. Plaintiffs were never sent a formal "notice of default" or any communication entitled purporting to assert rights to declare plaintiffs in "contractual default" by VFI. However, Plaintiffs had engaged in a longstanding debate with Defendants involving the payment of a relatively small amount of royalties to VFI, in light of VFI's numerous and admitted accounting errors that had deprived them of monthly revenues in excess of the royalty amounts.

14. Plaintiffs made concerted and ongoing efforts to resolve these very simple and straightforward accounting issues ***directly with Defendant Lewis,*** among other of the Defendants' authorized personnel – to recoup dollars being wrongfully withheld by the franchisor due to either malice or ineptitude.

15. Plaintiffs' good faith efforts to do business with their franchisor "partner" was apparently viewed by TPB and its management as some type of "insubordination" and/or an effort to mobilize or otherwise antagonize and inflame the relationship between VFI and its franchisees.

16. TPB and IVG, and their primary corporate representatives, Waxman, Purdy and Lewis, failed to understand the obvious – the extreme and building tension, and mistrust, between VFI and its franchisees was long-standing and was born out of VFI's constant mishandling of basic issues, its lack of focus on actual growth and development of its brand, its failure to timely address numerous issues relating to regulations regarding "vaping" products that came to a head in Summer 2019.

17. Franchisees also became aware at this time of a series of deceptive practices used to lure franchisees to enter the franchise system in the first place, and myriad other failures by VFI to run a functioning franchise business.

18. In July 2019, despite the fact that the signatory franchisor VFI never sent any "default correspondence" to Plaintiffs for any alleged violation of the franchise agreement (for

non-payment of royalties fees or otherwise, and, if one existed, without any opportunity to cure such a default, TPB, in concert with IVG, sent Plaintiffs a letter purporting to "terminate" their franchise rights. The communication was sent from TPB's general counsel, from TPB's own letterhead. ***TPB was a non-signatory to Plaintiffs' franchise agreement, development agreement or any addenda, and had no contractual right (or assumed right) to terminate any of the agreements, unless of course it was acting the capacity of the successor or alter ego of VFI, which it has consistently denied.***

19. At all relevant times, TPB held itself out as the party determining that the relationship needed to end but denied that it was acting in the capacity of the franchisor while making these types of decisions. Attached hereto as **Exhibit A** is a true copy of the Termination Letter.

20. Based upon its own admission by its general counsel, Donald Becker, Esq., TPB, in its capacity as VFI's "parent" company and the owner of the franchise company, determined that Plaintiffs had become a "disruption" to VFI's franchise system. Becker indicated that this was TPB's determination from its highest level. It was clear that TPB, not VFI, terminated Plaintiffs, without contractual right, cause or justification to do so.

21. Upon information and belief, ***no other VFI franchisee*** has ever been terminated by TPB. Rather, VFI has effectuated such termination pursuant to its ***contractual right*** to do so.

22. In addition, TPB and IVG through their representatives Purdy, Waxman and Lewis gave the directive that Plaintiffs should be cut off from VFI's point of sales system, which literally terminated Plaintiffs' ability to operate their business. Plaintiffs made prompt demands, via legal counsel, to TPB to restore Plaintiffs' system access, which were callously rebuffed without cause or explanation.

23. In fact, TPB responded that Plaintiffs' vocal opposition to VFI's flagrant mismanagement, misrepresentations and related business issues was "hurting the brand." In other words, Plaintiffs' honesty and efforts to rectify obvious wrongs was causing TPB's new pet acquisition "bad PR."

24. As bluntly admitted by its general counsel, Donald Becker, Esq., TPB, in its capacity as VFI's "parent" company and the owner of the franchise company, determined that Plaintiffs had become a "disruption" in VFI's franchise system. Becker indicated that this was TPB's determination from its highest level and a driving force in its decision to interfere in Plaintiffs' long-standing relationship with VFI.

25. In response to Plaintiffs' demands to be restored to active franchisee status, TPB again represented, through its legal counsel Donald Becker, Esq., that it was merely the parent company of IVG (the parent of VFI) and was not acting as the franchisor. However, it did not, because it could not, explain how it had the rights to assert the franchisor's exclusive right to terminate a franchisee in the first place.

26. TPB worked in concert with IVG and Lewis, among others, to take other action to effectuate this improper termination – which amounted to theft of any vestige of Plaintiffs' franchise business as well as an obvious interference in the contract between Plaintiffs and VFI.

27. Upon information and belief, any customers of Plaintiffs' franchise locations were then purposefully redirected to VFI's corporate website and/or competitor franchise locations.

28. Upon further information and belief, TPB and IVG and their respective management continued to cast aspersions upon Plaintiffs and referred to them as bad franchisee operators, and problematic franchisees, prior to and after the illegal termination. Defendants'

statements were made to justify their rash and illegal actions in literally kicking Plaintiffs' out of their subsidiary's franchise system.

29. From Summer 2019 to the present date, nearly one-half of the active VFI franchisees that existed in the franchise system have either left the franchise system voluntarily, have been terminated as franchisees. The remainder of franchisees are being pushed into an alternative arrangements with VFI due to the fact that the franchisor continues to mismanage the business on every level.

30. TPB and IVG have already been sued in this jurisdiction by former franchisees in the matter, *Hinton v. Turning Point Brands, et al., Case No.* **1:20-cv-21476-JAL** in connection with the alleged fraudulent inducement of these franchisees' investment in a franchise territory in the VFI system.

31. TPB and IVG have been named in that case as having participated in a fraud in the inducement of the Hintons' franchise investment and have steadfastly denied that they acted directly in connection with the franchise, that they have acted as the *de facto* franchisor, that they are the "alter ego" of the franchisor, that they have any kind of successor liability in connection with franchisee claims, and have sought to "stay" the lawsuit pending arbitration against the franchisor. They have made this position a matter of public record. Attached hereto and made a part hereof as **Exhibit B**, is TPB and IVG's Motion to Stay the Hinton litigation pending arbitration.

32. If TPB and IVG are correct in their position in the *Hinton* matter that they are not the alter ego of VFI and/or acting as the *de facto* franchisor with respect to business operations, the actions taken against the Plaintiffs by Defendants, by and through their "termination" of Plaintiffs' franchise rights, and simultaneous, purposeful termination of Plaintiffs' access to the

VFI franchise system, platform and related tools, ***was done in a third-party capacity*** and without any contractual privity or related authority. The actions taken to divest Plaintiffs of their franchise rights constitute a knowing interference with the contractual relationship between Plaintiffs and the franchisor VFI and all associated business and financial benefits.

33. The diversion of Plaintiffs' customers and the exercise of dominion over its franchise rights, associated revenues, goodwill, equity interest in the stores, and related chattels, also constitutes conversion.

34. Plaintiffs were unfairly targeted by TPB and IVG on the basis that they spearheaded efforts to uncover systematic fraud and abuse throughout the VFI system. In particular, Plaintiff Rice had numerous and ongoing conversations with Defendant, Lewis and various other members of management, wherein he frankly and directly pointed out instances of deceptive practices, unfair competition being fostered within the system, the aforesaid accounting problems, disclosure issues in violation of federal and state law.

35. TPB and IVG saw these efforts – which were meant to salvage Plaintiffs million-dollar plus investment in what was becoming more obviously a sham franchise operation – as capable of further weakening their already failing franchisor subsidiary and took these efforts in blatant retaliation against Plaintiffs to deprive them of their investment and have knowingly exposed Plaintiffs to further liability to various third-parties (i.e., commercial landlords, third-party vendors, etc.).

36. Defendants, TPB, IVG and Lewis' actions, in the aggregate have caused a catastrophic level of economic harm to Plaintiffs, in excess of their $1,500,000 investments. Defendants actions were performed in bad faith, in contravention of the laws of the State of Florida, and with intentional malice.

37. Plaintiffs seek compensatory, consequential and punitive damages against the Defendants, jointly and severally.

38. As set forth herein, as a direct and proximate result of the tortious conduct of the Defendants, individually and in concert with each other, Plaintiffs have sustained and continue to sustain catastrophic financial losses and monetary damages of more than $2 million.

**THE PARTIES**

39. Plaintiff, 4GP, Inc. is a corporation with a primary business address of 9537 Mount Vernon Circle, Alexandria, VA. 4GP, Inc. was a signatory to Plaintiffs' franchise agreement with Vaporfi Franchising, LLC.

40. Plaintiff, Brett Rice ("Rice") an individual, is a resident of the State of Virginia. Rice signed the franchise agreement in his representative capacity as an owner of 4 GP, Inc.

41. Plaintiff, Victor Bonomi, an individual, is a resident of the State of Virginia. Bonomi signed the franchise agreement in his representative capacity as an owner of 4 GP, Inc.

42. Defendant, International Vapor Group, Inc. ("IVG") is a corporation with principal offices located at 15050 Northwest 79 Center Suite 101A , Miami Lakes, FL 33016. IVG regularly does business in the State of Florida and in this district and, as the owner of VaporFi Franchising LLC and its franchise business, was directly involved in the fraudulent and other conduct alleged herein.

43. Defendant, Turning Point Brands, Inc. ("TPB"), a Delaware Corporation, is the owner of Defendant IVG and the owner of the VaporFi Franchise System. Its principal place of business is located at 5201 Interchange Way, Louisville, KY 40229. TPB regularly does business in the State of Florida and directs substantial amounts of business to this district in connection with its operation and management of IVG and the VaporFi franchise business.

44. Defendant, Graham Purdy is an individual and the Chief Executive Officer of Defendant, Turning Point Brands, Inc., with principal offices in Louisville, KY, and has held this position since 2019. Since that time, upon information and belief, and based upon statements made by various authorized corporate representatives, Purdy has been making decisions on behalf of VFI since at least 2019, despite holding that entity out as a wholly owned subsidiary. Upon further information and belief, Purdy was directly responsible for the actions taken in contravention of Plaintiffs' franchise and development rights in the VaporFi Franchising, LLC franchise system and would have given the order to TPB representatives to terminate the franchise agreement of Plaintiff.

45. Defendant, Marc Waxman is an individual residing in the State of Florida and the Chief Operating Officer ("COO") of Defendant, International Vapor Group, Inc., with principal offices in the State of Florida. Based upon public filings, upon information and belief, Waxman has held this role since 2013. Waxman has also been held out to the public as the COO of VaporFi Franchising, LLC or VaporFi. Waxman was directly responsible for the actions taken in contravention of Plaintiffs' franchise and development rights in the VaporFi Franchising, LLC franchise system.

46. Defendant, Coartni Lewis is an individual residing in the State of Florida. Defendant Lewis is the Vice President of Store Operations for Defendant, IVG and was directly responsible for the actions taken in contravention of Plaintiffs' franchise and development rights in the VaporFi Franchising, LLC franchise system. Lewis reports directly to Defendants Waxman and Purdy.

47. Defendants, John Does 1-10, are individuals who are currently unknown, but who are believed to have taken part in the actions complained of herein within the State of Florida and

in this district. John Does 1-10 are believed to have regularly done business in the State of Florida and have availed themselves of the laws and jurisdiction of this Court.

48. Defendants ABC Companies 1-10 are legal entities that are currently unknown, which are believed to have taken part in the actions complained of herein within the State of Florida and in this district. ABC Companies 1-10 are believed to have regularly done business in the State of Florida and have availed themselves of the laws and jurisdiction of this Court

**JURISDICTION AND VENUE**

49. This court has personal jurisdiction over each of the named Defendants in this action because each of the Defendants regularly transacted business in this district during all time periods relevant to this Complaint. Moreover, many activities giving rise to this action have taken place through contacts and communications in and into this district.

50. Personal jurisdiction is proper before this Court pursuant to Fla. Stat. § 48.193(1)(a)(1) and (2) because Defendants operate, conduct, engage in, and carry on business in Florida. Personal jurisdiction is also proper before this Court pursuant to Fla Stat. § 48.193(2) because Defendants engage in substantial and not isolated activity within Florida.

51. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

52. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action have occurred in the Southern District of Florida. Several named defendants reside or are headquartered in this district. Venue lies in the Southern District of Florida under 28 U.S.C. § 1391 because: (a) certain of the defendants reside or do business and are amenable to service there.

**FACTS COMMON TO ALL COUNTS**

53. In 2014 Plaintiffs began investigating the potential of making an investment in the ownership and operation of physical store locations in a vape shop franchise concept and, in the process, were introduced to Defendant IVG and its management, which at the time was developing various subsidiary franchise business/concepts.

54. Leading the sale process, was a third-party franchise consultant and sales business operation known as Franchise Creator that acted as a middleman between Plaintiffs, IVG and the franchisor subsidiary VFI.

55. At the helm of the operation was IVG's CEO Nicolas Molina, who touted his entrepreneurial expertise, business experience and ability to develop and use a technology platform and peerless point of sales system to drive a franchise-style business.

56. From the earliest stages of these discussions it became clear that IVG was the entity that controlled the franchise and that Molina was, in essence, the owner and primary decision maker of the IVG. IVG was also the Managing Member of VFI and the entities appeared to share personnel.

57. What was unclear, however, was exactly what role IVG played in the day-to-day franchise operations. As time progressed, much of this responsibility was delegated to Defendant, Lewis who was employed by IVG but was assigned a title at VFI.

58. Initially, Plaintiffs were presented the opportunity to invest in a "Vaporzone" brand franchise. Plaintiffs were provided a "Vaporzone" Franchise Disclosure Document and form franchise agreement by Franchise Creator and were under the impression that this would be the franchise business in which they would invest.

59. After initial discussions, Franchise Creator, at the apparent direction of IVG, advised in an abrupt and somewhat vague manner, that the franchisor was changing the name of the franchise from Vaporzone to VaporFi, and that it was necessary to re-disclose Plaintiffs with a new FDD for the new "VaporFi" brand system.

60. While unorthodox, Plaintiffs believed that since the franchise system was in its nascent stages, such changes were not necessarily unusual and may have been related to subtle changes being made to the concept, value proposition and/or brand creation. Despite the somewhat unclear change in direction, Plaintiffs determined to continue negotiating to potentially acquire franchise rights in the VaporFi business.

61. In particular, Plaintiffs were excited by the notion of investing in a system that was in the process of being built. They trusted IVG and Molina's intentions and moved forward in their communications with Franchise Creator, the franchisor, IVG and VFI.

62. After months of negotiations with VFI and its sales team, which again was spearheaded by the entity Franchise Creator, Plaintiffs agreed to enter into a VFI franchise agreement and Development Agreement to open five (5) store locations.

63. Throughout 2014 and early 2015, VFI and its agent Franchise Creator lobbied aggressively to persuade Plaintiffs to invest in this unproven system and promised that Plaintiffs would be operating thriving physical locations that would facilitate VFI it its purported efforts to establish an extensive geographic footprint and strong, national brand recognition.

64. Plaintiffs, being sophisticated businessmen and investors in a number of other businesses, were not the "typical" franchisee.

65. Indeed, Plaintiffs, at all relevant times, negotiated aggressively, since they understood from other business ventures that there were certainly risks and pitfalls associated with

franchising, in the event that a franchisor could not properly provide the requisite support and service to its franchisees.

66. Plaintiffs made no effort to hide the fact that they would hold the franchisor and its management responsible to uphold each and every one of their obligations under the agreements.

67. In March 2015, after having performed their due diligence, and in obvious reliance upon IVG's alleged good intentions, Plaintiffs entered into multiple franchise agreements for the rights to open, and eventually did open, 4 physical store locations. As of the time of the "termination" that is the subject of this dispute, Plaintiffs had three remaining franchise locations open and operating in Washington D.C., Arlington Virginia, and Alexandria, Virginia.

68. Plaintiffs also entered into a development agreement with VFI associated with their rights to open the (5) store locations. The development agreement is a separate agreement from the franchise agreement and provides a franchisee rights to develop a territory within a system. Such territorial rights have significant value and such value was a driving force behind Plaintiffs' desire to open multiple franchise units in the system.

69. In connection with the Franchise Agreement and Development Agreement, the parties negotiated various addenda to these agreements in which the standard terms of the form franchise agreement were negotiated.

70. Again, Plaintiffs negotiated these various addenda aggressively, as they were concerned about contractual provisions related to site location, a tight development schedule, costs relating to royalties, marketing, advertising and promotion and other potential costs more generally associated with their investment.

71. At all relevant times, Plaintiffs had every intention to abide, and did abide, by the rigorous development schedule contained in the development and to open and operate all of the contemplated locations and to thrive as multi-unit owner franchisees.

72. Plaintiffs' diligence in operating the stores was matched by their willingness to invest substantial sums of money in connection with the build-out, development and marketing of their store locations, all of which inured to the benefit of VFI and its parent company, IVG.

73. Indeed, Plaintiffs paid several hundred thousand dollars in franchise fees and build out fees associated with each of their locations. Plaintiffs continued to invest money in the locations and also bore significant expense of commercial lease at each location.

74. Despite initial concerns regarding franchise operations, which were repeatedly voiced to VFI personnel, including but not limited to its former CEO Nicolas Molina, Plaintiffs attributed these issues to system growing pains and worked collaboratively with management to address these development hurdles.

75. At various times, Plaintiffs addressed their concerns about franchise management to Molina and requested in person meetings. Molina and IVG appeared not to anticipate franchisees and developers such as Plaintiffs addressing the franchisor as a "partner" in their venture and occasionally took exception to Plaintiffs' frank and direct critiques about what they believed was mismanagement, negligent operations at the corporate level. Notably, Plaintiffs were not the only franchisees and developers who were complaining about numerous issues that existed in the franchise that VFI and its management and ownership either would not, or could not, correct.

76. Most critically, as their time in the system progressed, Plaintiffs identified what appeared to be an active effort by IVG to re-direct franchisee store customers to its subsidiary, VFI's own ***corporate owned website***, www.vaporfi.com.

77. As in most franchise systems, active franchisees in the VFI system would regularly communicate. Plaintiffs, understanding that their concerns may be having an impact on the system as a whole, would speak to other developers, multi-unit owners and single unit owners and steadily learned that the issues they were addressing were being felt system-wide.

78. Throughout 2017 and 2018, these issues were continually raised and promises were made to address, rectify and improve system operations. IVG would often resort to "*mea culpas*", often feigning ignorance or blaming shifting roles within their organization in order to justify both ongoing accounting errors, point of sales system glitches and failures, and, of course, the chief complaint that franchisee store sales were being diverted to the corporate online store.

79. Rather than address and resolve these issues, or even work to mitigate the obvious impact the system's failures were having on franchisee performance, IVG allowed the issues to metastasize to impact the system at large.

80. In 2018, there were rumblings within the system that Molina and IVG were preparing to sell the business and its subsidiary franchise businesses to a third-party. Upon information and belief, IVG made certain efforts to dress-up the business for sale and made certain misrepresentations to potential acquirers regarding both the financial health, performance and overall status of the franchised businesses it owned, including but not limited to VFI. Franchisees and developers such as Plaintiffs were at all times excluded from a majority of IVG's dealings with potential purchasers (or even advised of what the company's actual plans were). Ultimately Defendant, IVG, VFI and certain other subsidiaries were acquired by Defendant, TPB.

81. In September 2018, TPB acquired IVG with much press coverage and fanfare within the industry. Plaintiffs and other franchisees within the VFI system were promised by Defendant Lewis and certain other personnel that many of the issues related to the franchise system

would be rectified via the acquisition by TPB, a publicly traded company with a strong reputation. Initially, Molina remained associated with the franchise as a consultant, but was later removed from that role when allegations of fraud were lodged against VFI by franchisees in Summer 2019.

82. Around this time Waxman took a more prominent role at IVG and Purdy assumed the title of CEO of TPB.

83. Unfortunately, from the date of the acquisition forward, none of the ongoing issues with the franchise were cured and, in particular, the "diversion" of franchisee store business continued and simple accounting issues – which always conveniently benefitted the franchisor and deprived Plaintiffs and other franchisees persisted.

84. As franchise companies and their owners are wont to do, Plaintiffs and similarly situated franchisees' objective complaints (supported by veritable heaps of empirical data) were met with scorn.

85. Franchisee operations issues were blamed, in part, on the franchisees' own "lack of business acumen" or "lack of effort" or, alternatively, were chalked up to tightening regulations and scrutiny related to vaping products.

86. Plaintiffs own issues with IVG and TPB, and specifically Waxman and Purdy, who were now literally running the day-to-day operations of the subsidiary VFI's franchised business when they were not delegating these same day-to-day responsibilities to Lewis and certain other personnel, grew increasingly more pronounced in the early part of 2019.

87. During this time period, Plaintiff Rice had numerous communications with Ms. Lewis regarding accounting errors that had been identified and acknowledged and had attempted to negotiate a resolution of these issues as they pertained to royalties and other fees that had not been paid.

88. Defendant Lewis consistently patronized Plaintiffs, and other franchisees raising nearly identical complaints, and offered pat answers to probing questions. Ms. Lewis also made clear that she was acting at the express direction of TPB and IVG, and specifically Purdy and Waxman.

89. After Defendant Lewis had failed to rectify a simple accounting issue with Plaintiffs, the issue appeared to be directed to TPB's general counsel, Donald Becker, Esq. Becker attempted to justify the ongoing and indefensible accounting errors and attempted to suggest that VFI was justified in withholding or diverting franchisee revenues. Importantly, Becker disclaimed any of Defendant Lewis' prior representations, that she repeatedly had made to Plaintiff Brett Rice, that Plaintiffs could offset royalty payments until these accounting issues were resolved.

90. It is unclear why VFI, if it was indeed a separate and distinct entity and wholly owned subsidiary, and the signatory to Plaintiffs' various agreements, which, at all relevant times, was being held out as the franchisor, did not directly solve, handle or communicate its position on this issue.

91. Between the months of June through August 2019, the franchise system was rife with discontent, with conference calls between franchisees, developers and corporate personnel often devolving into a wide range of accusations that were mirrored across the various store owners – one notable issue was the recently uncovered failure by VFI and IVG to properly disclose issues relating to numerous consumer fraud complaints against the principal, Nick Molina, in the VFI FDD.

92. While Plaintiffs, and particularly Rice, were active participants in these calls, it was around this time that TPB and IVG began to determine that Rice was "disrupting" the franchise system.

93. Rather than take action to assuage Plaintiffs' and other franchisees' obviously meritorious concerns TPB, IVG and Lewis conspired to take unprecedented action.

94. Without any contractual authority, and, by their own admission, without any assigned right to do so, TPB, IVG and Lewis, in her role as a representative of IVG, determined that they would unilaterally terminate all of Plaintiffs' franchise rights by declaring the Plaintiffs' various agreements terminated.

95. On July ___, 2020, in his capacity as general counsel of TPB, Becker advised Plaintiffs via a termination letter, that all of their franchise rights were terminated effective immediately. Becker reports to Purdy, and upon information and belief, would have had to have consulted with Waxman and Lewis before sending the letter.

96. Shockingly, Becker's letter was sent from TPB's corporate offices in Louisville, KY and **from Turning Point Brands, Inc.'s own letterhead**. The letter was expressly sent by Becker, as general counsel for TPB, acting in the capacity of the parent of the subsidiary franchisees. No explanation was made why the letter was not coming from the Franchisor.

97. Notably, any franchisees, other than Plaintiffs, declared in default of the franchise agreements with VaporFi since 2019 (or terminated by VaporFi) have been terminated by the entity VaporFi, not IVG or TPB. These franchisees were also sent "default" notices pursuant to the terms of the parties' franchise agreement and were provided "opportunities to cure"

98. The letter also inferred that TPB, the parent company, had the affirmative right to terminate the contracts and referred explicitly to certain provisions in the franchise agreement and development agreements. The letter also failed to reference any prior default correspondence or formal notice of default (which had been sent to various other VFI franchisees for the non-payment of royalties in or about the same time period).

99. The letter and the alleged basis for the non-party TPB to "terminate" Plaintiffs specifically related to above-referenced dispute between Plaintiffs and Lewis. While not conceding that IVG had diverted revenues from Plaintiffs, which was Plaintiffs' chief complaint in connection with the payment of royalty fees, IVG did offer Plaintiffs a "settlement payment" of $6,000 to partially compensate Plaintiffs for these diverted revenues. Plaintiffs were confused by and rejected this payment.

100. TPB and IVG's actions constitute a tortious interference with the subsidiary VFI's contractual relationship with Plaintiffs. Lewis, in her dual capacity with the various companies took direct action, at TPB, Purdy, Waxman and Becker's express direction to enforce the improper "termination" of the Plaintiffs' franchise agreement and affirmatively cut off Plaintiffs' access to VFI's point of sales (POS) system, which completely frustrated Plaintiffs' ability to operate their various franchise locations.

101. At the time of the illegal and improper actions of TPB, and Defendants collectively, to disenfranchise Plaintiffs' without any contractual or other legal or equitable right to do so, Plaintiffs had invested in excess of $1,500,000 in the VaporFi franchise system. As a direct and proximate result of these affirmative and intentional tortious acts by the various Defendants, Plaintiffs have lost the entire value of their investment in the three (3) remaining VaporFi franchise locations.

## COUNT I
## TORTIOUS INTERFERENCE WITH FRANCHISE AND DEVELOPMENT AGREEMENTS
## (AGAINST ALL DEFENDANTS)

102. Plaintiffs repeat the allegations contained in paragraph 1 through 101 and incorporate the same by reference herein.

103. Plaintiffs had multiple contractual agreements with VFI in March 2015, granting Plaintiff the rights to own and operate VFI brand franchise locations.

104. Without any contractual right or other express or implied legal right, TPB and IVG, in concert with Purdy, Waxman and Lewis, purposefully interfered with this relationship and purported to terminate Plaintiffs' franchise locations.

105. The State of Florida defines the tort of intentional interference with a contract consistent with the Restatement (Second) of Torts, which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing ***or otherwise causing*** the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts, § 766 (1979).

106. The elements of tortious interference with a business relationship are "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla.1985).

107. A protected business relationship need not be evidenced by an enforceable contract. Id. However, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." Register v. Pierce, 530 So. 2d 990, 993 (Fla. 1st DCA 1988).

108. The Supreme Court of Florida has expressly opined that a parent company may indeed tortiously interfere in the business relationship between a subsidiary franchise company and a plaintiff franchisee. *Gossard v. Adia Services, Inc.,* 723 So. 2d 182 (1998)(holding as an

issue of first impression that a parent company's alleged actions in causing a franchisor to breach the terms of a franchise agreement established a prima facie claim for tortious interference as defined by Florida law.)

109. Defendants each were aware of existing contractual relationships between Plaintiffs and VFI.

110. While disclaiming any obligations as franchisor after acquiring VFI in 2018, Defendant TPB purposefully interfered in the business relationship between the parties, and, in concert with IVG and Lewis, actively cut off all ties between Plaintiffs' then open and operating locations and the franchisor, VFI. See, **Exhibit A**.

111. Plaintiffs, through their counsel, challenged both TPB's ability to take action to terminate an agreement between its subsidiary and a franchisee, which rendered Plaintiffs' multi-year and multi-store investment ostensibly valueless.

112. TPB demurred and stood by its ability to interfere with a separate contractual relationship between Plaintiffs and VFI, once again reiterating its vendetta against Plaintiffs' for the alleged disruption they caused by voicing legitimate and long-recognized issues in the franchise system.

113. Ironically, TPB's abrupt and illegal interference was coupled with a settlement offer to pay Plaintiffs for revenues wrongfully withheld by VFI as related to its accounting errors.

114. As a direct and proximate result of Defendants' actionable tortious interference with the franchise agreement, development agreement and addenda between Plaintiffs and VFI, Plaintiffs have sustained and continued to sustain catastrophic economic damages.

**COUNT II**
**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

115. Plaintiff repeats in lieu of repetition all of the allegations in paragraphs 1-101 of the Complaint.

116. In order to establish a claim for conversion of money under Florida law, a plaintiff must demonstrate, by a preponderance of the evidence:

(1) specific and identifiable money;

(2) possession or an immediate right to possess that money;

(3) an unauthorized act which deprives plaintiff of that money; and

(4) a demand for return of the money and a refusal to do so.

*See Navid v. Uiterwyk Corp.,* 130 B.R. 594, 595-596 (M.D.Fla.1991); *see also Challa v. Challa (In re Challa),* 186 B.R. 750, 759 (Bankr.M.D.Fla.1995).

117. Neither knowledge nor intent are required. *In re Challa,* 186 B.R. 750, 759 ("Additionally, courts have found that `neither knowledge nor intent' is required to maintain an action for conversion"); *Navid,* 130 B.R. 594, 596 (accord); *Florida Farm Bureau Casualty Ins. Co. v. Patterson,* 611 So. 2d 558, 559 (Fla. 1st DCA 1992) (accord); *Eagle v. Benefield-Chappell, Inc.,* 476 So. 2d 716, 718 (Fla. 4th DCA 1985) ("Liability for conversion does not require proof of knowledge or intent to deprive one of his property"); *but see Small Bus. Admin.,* 864 F. Supp. 1254, 1262 (holding that conversion requires possession in conjunction with a present intent to deprive a person entitled to possession of their property).

118. In other words, "[t]he tort may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession." *Seymour v. Adams,* 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994); *City of Cars, Inc. v. Simms,* 526 So. 2d 119, 120 (Fla. 5th DCA), *rev. denied,* 534 So. 2d 401 (Fla.1988) ("Any act of a person in asserting a right of dominion over a chattel which is inconsistent with the right of the

owner and deprives the owner of the right of possession to which the owner is entitled may constitute a conversion, whether the act is accomplished with, or without, any specific wrongful mental intent").

119. Intentional conversion of property also entitles Plaintiffs to punitive damages. *Sporting Goods Distribs. v. Whitney,* 498 F. Supp. 1088, 1092 (N.D.Fla. 1980) (holding that punitive damages are appropriate on a conversion claim "where the circumstances surrounding the conversion are such to show fraud, actual malice, deliberate violence, or oppression, or such gross negligence as to indicate a wanton disregard of the rights of others") (internal citations and quotations omitted); *Foley v. Dick,* 436 So. 2d 139, 141 (Fla. 2nd DCA 1983) (accord).

120. The purported termination of Plaintiffs' business resulted in Plaintiffs' complete loss of its franchise rights and ability to operate their business that they had developed from the ground up for a period of approximately five (5) years.

121. TPB, IVG and Lewis had no contractual or other rights to effectuate the termination of the business and/or to disenfranchise Plaintiffs, effectively rendering their rights to the operate the stores valueless.

122. Consistent with IVG and TPB's desire to continue to divert franchisee business to its corporate stores, customers of Plaintiffs stores were subsequently directed to the vaporfi.com online store for future product sales.

123. TPB, IVG and Lewis knowingly, improperly and illegally asserted dominion over Plaintiffs' economic interest in the stores, and all associated value and goodwill.

124. Plaintiffs promptly advised Defendants, via their in-house legal counsel, that their property (i.e., interest in their franchise locations, associated rights, goodwill and chattels) be promptly returned based upon Defendants' improper control and dominion over same.

125. Defendants demurred and asserted that they were entitled to take back the franchised businesses, associated equity and franchise rights, without asserting any contractual or other legal right to do so.

126. As a direct and proximate result of Defendants' actionable tortious interference with the franchise agreement, development agreement and addenda between Plaintiffs and VFI, Plaintiffs have sustained and continued to sustain catastrophic economic damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a) compensatory damages in an amount to be determined at trial, for the Defendants Turning Point Brands, Inc., International Vapor Group, Inc., Graham Purdy, Marc Waxman and Courtni Lewis' intentional interference with Plaintiffs' franchise agreement and development agreement;

b) compensatory damages in an amount to be determined at trial, for the Defendants Turning Point Brands, Inc., International Vapor Group, Inc., Graham Purdy, Marc Waxman and Cornti Lewis' intentional conversion of the value of Plaintiffs' franchise rights in their VaporFi Franchising, LLC franchise locations (including the value of Plaintiffs' equity in the store locations and all associated revenues, goodwill, chattels and associated benefits of ownership) pursuant to the franchise agreement and development agreement;

c) punitive damages for Defendants' actionable tortious conduct;

d) all costs of this action, including reasonable attorneys' fees and costs; and,

e) such other and further relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable herein.

October 26, 2020

Respectfully submitted,

/s/ Matt Person

**MATT PERSON, ESQUIRE**
**Attorney for Plaintiff**
Florida Bar 103754
9560 NW 41 Street
Doral FL 33178
Telephone (305) 640-5754
Fax (888) 602-4190